IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOSHUA D. ZOLLICOFFER a/k/a
　　PASSION STAR,
　　　　　　　　　　　Plaintiff,

*versus*

BRAD LIVINGSTON, personally and in his
　　official capacity as Executive Director of the
　　Texas Department of Criminal Justice
　　("TDCJ");
WILLIAM STEPHENS, personally and in his
　　official capacity as Director of TDCJ's
　　Correctional Institution Division;
LYNNE SHARP, personally and in her official
　　capacity as TDCJ Safe Prisons/PREA Manager
　　and PREA Ombudsman;
RALPH BALES, in his personal capacity;
JONI WHITE, personally and in her official
　　capacity as Assistant Director of TDCJ's
　　Classification and Records Department;
ROBERT EASON, personally and in his official
　　capacity as Deputy Director Prison and Jail
　　Operations of TDCJ;
LORIE DAVIS, personally and in her official
　　capacity as Deputy Director Management
　　Operations of TDCJ;
BRUCE ARMSTRONG, in his personal capacity;
FERNANDO FUSTER, in his personal capacity;
KENNETH DEAN, in his personal capacity;
BRIAN BLANCHARD, in his personal capacity;
RENE MALDONADO, in his personal capacity;
RALPH MAREZ, JR., in his personal capacity;
JAMES SIGMUND, in his personal capacity;
PRINCE PICKETT, in his personal capacity; and
LESLIE WALTERS, in her personal capacity,
　　　　　　　　　　　Defendants.

Case No. 4:14-cv-03037

*Jury Trial Demanded*

**PLAINTIFF'S AMENDED COMPLAINT
FOR
PRELIMINARY AND PERMANENT
INJUNCTIVE RELIEF,
DECLARATORY JUDGMENT, AND
DAMAGES**

1.      Plaintiff Joshua Zollicoffer a/k/a Passion Star ("Ms. Star" or "Plaintiff")[1] is a thirty-one-year-old transgender woman in the custody of the Texas Department of Criminal Justice ("TDCJ") who has been brutally attacked by men incarcerated with her and continues to be tormented with escalating threats of assault, rape, and murder. Ms. Star has repeatedly begged TDCJ officials to protect her.

2.      Deliberately indifferent to these harms, the defendants have repeatedly refused to place Ms. Star in a secure housing placement, known as "safekeeping"[2] or take other reasonable steps to reduce the acts and threats of harm to her. Instead, the defendants have forced Ms. Star to remain in the general population near her aggressors, where she has faced documented serious injuries and escalating risks of additional serious harm.

3.      Further, despite knowing that TDCJ prisons have exceptionally high rates of inmate-on-inmate assault, particularly against lesbian, gay, bisexual, transgender ("LGBT"), and gender-nonconforming people in custody, TDCJ officials condoned, ratified, and/or adopted widespread practices and customs that caused Ms. Star to be harmed and failed to train and/or supervise officers on policies and procedures that could have prevented the harm to her.

4.      By this action, Ms. Star seeks preliminary and permanent injunctive relief to stop the defendants' ongoing constitutional violations, along with declaratory relief and damages.

## I.      JURISDICTION AND VENUE

5.      Plaintiff brings this action seeking preliminary and permanent injunctive relief,

---

[1] Although Plaintiff's legal name is Joshua D. Zollicoffer, she is known by and uses the name Passion Star in accordance with her female gender identity. Accordingly, this complaint refers to Plaintiff as Ms. Star and uses female pronouns to refer to her.

[2] Safekeeping status is a housing status assigned to individuals in custody who need protection from other inmates in the general population, and whose need for protection could be met by housing them separately. In addition, safekeeping offenders receive their recreation time and meals apart from the general population.

declaratory relief, and damages pursuant to 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and jurisdiction to grant declaratory relief pursuant to 28 U.S.C. § 2201.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the relevant events occurred within the district, and pursuant to 28 U.S.C. § 1391(b)(1) because Defendants Livingston, Stephens, Sharp, Bales, White, Eason, Davis, Armstrong, and Fuster reside in and have or had offices in this district, and all defendants are residents of Texas.  Moreover, Huntsville is the location of TDCJ's headquarters and one of its administrative offices.

8.      This Court has personal jurisdiction over each and every defendant because, upon information and belief, all defendants are residents of Texas and were employed in Texas acting under color of state law during all relevant times.

## II.      THE PARTIES

9.      **PLAINTIFF PASSION STAR**, a citizen of Texas, is a transgender woman in the custody of TDCJ. From approximately 2011 to 2013, Ms. Star was housed in the Hughes Unit in Gatesville, Texas ("Hughes"). On or around December 6, 2013, she was moved to the Robertson Unit in Abilene, Texas ("Robertson"). On or around November 17, 2014, Ms. Star was transferred to the Clements Unit ("Clements") in Amarillo, Texas, where she is currently housed.

10.     **DEFENDANT BRAD LIVINGSTON** ("Livingston") is the Executive Director of TDCJ. As such, Defendant Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. He has ultimate responsibility within TDCJ for overseeing the day-to-

day operation of state prison facilities, including the Hughes, Robertson, and Clements facilities, and is responsible for ensuring that people incarcerated in TDCJ facilities are protected from sexual assault and other violence and that correctional officers adhere to federal and state law, as well as official TDCJ policy. Livingston has testified in connection with the high prevalence of sexual assault in TDCJ facilities and the deficiencies with the implementation of Prison Rape Elimination Act ("PREA") in Texas.  Defendant Livingston maintains an office in Walker County, Texas, and upon information and belief, resides in Walker County, Texas. He is sued in his official and personal capacities.

11.     **DEFENDANT WILLIAM STEPHENS** ("Stephens") is Director of Correctional Institutions Division of TDCJ. As such, Defendant Stephens is responsible for their training, supervision, and conduct of all TDCJ correctional officers, guards, and TDCJ employees and contractors. He has ultimate responsibility within TDCJ for overseeing the day-to-day operation of state prison facilities, including Hughes, Robertson, and Clements, and is responsible for ensuring that people incarcerated in TDCJ facilities are protected from sexual assault and other violence and that correctional officers adhere to federal and state law, as well as official TDCJ policy. He is responsible for the Safe Prisons/PREA Management Office, Classification and Records, Correctional Training and Staff Development, and the Security Threat Group Management Office. Defendant Stephens maintains an office in Walker County, Texas and, upon information and belief, resides in Walker County, Texas.  He is sued in his official and personal capacities.

12.     **DEFENDANT LYNNE SHARP** ("Sharp") was the TDCJ Safe Prisons/PREA Manager during relevant times for this action.  As the TDCJ Safe Prisons/PREA Manager, she was responsible for the implementation and enforcement of TDCJ's Safe Prisons/PREA Plan,

4

enforcing TDCJ "zero tolerance policy" toward sexual abuse and sexual harassment, and overseeing unit and regional Safe Prisons/PREA managers at TDCJ facilities, including Hughes, Robertson, and Clements. Defendant Sharp, now the PREA Ombudsman for TDCJ facilities, including Hughes, Robertson, and Clements, maintains an office in Walker County, Texas, and upon information and belief, resides in Walker County, Texas. She is sued in her official and personal capacities.

13.     **DEFENDANT RALPH BALES** ("Bales") was the PREA Ombudsman during relevant times for this action and had been appointed by the Texas Board of Criminal Justice to respond to and eliminate the occurrence of sexual assault in correctional facilities. The primary responsibilities of the PREA Ombudsman are to monitor department policies for the prevention of sexual assault in correctional facilities; oversee the administrative investigation of inmate complaints of sexual abuse; ensure the impartial resolution of inmate complaints of sexual assaults; and collect statistics regarding all allegations of sexual abuse from TDCJ correctional facilities, including Hughes, Robertson, and Clements. Defendant Bales maintained an office in Walker County, Texas, and upon information and belief, resides in Walker County, Texas. He is sued in his personal capacity.

14.     **DEFENDANT JONI WHITE** ("White") is Assistant Director of TDCJ's Classification and Records Department. She is responsible for supervising the management of the State Classification Committee ("SCC"), Classification and Intake Operations, and the Classification Records Office. She is also responsible for the overall management and application of all TDCJ classification plans, policies, and procedures. Defendant White maintains an office in Walker County, Texas, and resides in Walker County, Texas. She is sued in her official and personal capacities.

15.     **DEFENDANT ROBERT EASON** ("Eason") is the Deputy Director of the Prison and Jail Operations Department in the Correctional Institutions Division of the TDCJ. As such, he is responsible for overseeing, *inter alia*, the six Regional Directors, and managing secure prisons, and other correctional facilities, in the state of Texas. He also oversees the security operations department in the TDCJ. Defendant Eason maintains an office in Walker County, Texas, and upon information and belief, resides in Walker County, Texas. He is sued in his official and personal capacities.

16.     **DEFENDANT LORIE DAVIS** ("Davis") is the Deputy Director of the Management Operations Department in the Correctional Institutions Division of the TDCJ. As such, she is responsible for overseeing, *inter alia*, Correctional Training and Staff Development, Plans and Operations, Safe Prisons/PREA Management Office, and Security Threat Group Management Office in the TDCJ. Defendant Davis previously served as the director of the TDCJ Correctional Institutions Division's Correctional Training and Staff Development Department, which provided training services to TDCJ employees. Defendant Davis maintains an office in Walker County, Texas, and upon information and belief, resides in Walker County, Texas. She is sued in her official and personal capacities.

17.     **DEFENDANT BRUCE ARMSTRONG** ("Armstrong") is an Assistant Regional Director in the Correctional Institutions Division. As such, he is responsible for overseeing the operations and safety of the units with his region, which include Hughes and Robertson. Defendant Armstrong personally participated in the denial of one or more of Plaintiff's grievances as discussed below. Defendant Armstrong maintains an office in Walker County, Texas, and upon information and belief, resides in Walker County, Texas. He is sued in his personal capacity.

6

18.    **DEFENDANT FERNANDO FUSTER** ("Fuster") is an Assistant Regional Director in the Correctional Institutions Division. As such, he is responsible for overseeing the operations and safety of the units within his region, which include Hughes and Robertson. Defendant Fuster personally participated in the denial of one or more of Plaintiff's grievances as discussed below. Defendant Fuster maintains an office in Walker County, Texas, and upon information and belief, resides in Walker County, Texas. He is sued in his personal capacity.

19.    **DEFENDANT KENNETH DEAN** ("Dean") was a Senior Warden at Hughes during all relevant times and, upon information and belief, is a resident of Texas. He is sued in his personal capacity.

20.    **DEFENDANT BRIAN BLANCHARD** ("Blanchard") was an Assistant Warden at Hughes during all relevant times and, upon information and belief, is a resident of Texas. He is sued in his personal capacity.

21.    **DEFENDANT RENE MALDONADO** ("Maldonado") was an Assistant Warden at Hughes during all relevant times and, upon information and belief, is a resident of Texas. He is sued in his personal capacity.

22.    **DEFENDANT RALPH  MAREZ, JR.** ("Marez") was a Major at Hughes during all relevant times and, upon information and belief, is a resident of Texas. He is sued in his personal capacity.

23.    **DEFENDANT JAMES SIGMUND** ("Sigmund") was a Captain at Hughes during all relevant times and, upon information and belief, is a resident of Texas. He is sued in his personal capacity.

24.    **DEFENDANT PRINCE PICKETT** ("Pickett") was a Sergeant supervising the 8 Building at Hughes during all relevant times and, upon information and belief, is a resident of

Texas. He is sued in his personal capacity.

25.     **DEFENDANT LESLIE WALTERS** ("Walters") was a Classification Secretary at Hughes during all relevant times and, upon information and belief, is a resident of Texas. She is sued in her personal capacity.

26.     At all relevant times, Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, White, Armstrong, Fuster, Dean, Blanchard, Maldonado, Marez, Sigmund, Pickett, Walters (collectively, "**Defendants**") acted under color of state law.

27.     Plaintiff does not seek monetary damages against Defendants in their official capacities.

### III.     FACTUAL BACKGROUND

28.     Ms. Star is a woman, who is black and transgender.  She is transgender because she was assigned the sex of male at birth, but identifies as a woman.[3]

29.     On or around December 3, 2002, a week after her nineteenth birthday, Ms. Star was sentenced to twenty years in prison and placed in the custody of TDCJ.[4] Since 2002, Ms. Star has been housed in at least seven sex-segregated male TDCJ facilities. From 2003 to 2006, she was housed in the Telford Unit in New Boston, Texas ("Telford"). From 2006 to 2007, she was housed in the Allred Unit in Iowa Park, Texas ("Allred"). From 2007 to 2008, she was housed in the Smith Unit in Lamesa, Texas ("Smith"). From 2008 to 2011, she was housed in the

---

[3] At earlier periods, when Ms. Star was less public about her transgender identity, she sometimes referred to herself in grievances and other written complaints as a gay man or a gay man with a female alias. While gender identity and sexual orientation are not the same, either identity places Ms. Star in a category of inmates who are recognized as particularly vulnerable to sexual abuse.

[4] The conviction, which was for aggravated kidnapping, arose from allegations that, on or around August 16, 2002, Ms. Star's boyfriend at the time refused to return a used Chevrolet that he was test driving to the Chevrolet dealership. Instead, he drove for nearly two hours with the salesman trapped in the passenger seat and Ms. Star in the back seat.

Coffield Unit in Tennessee Colony, Texas ("Coffield"). From 2011 to 2013, she was housed in Hughes in Gatesville, Texas. From December 2013 to November 2014, she was housed in Robertson in Abilene, Texas. In November 2014, she was transferred to Clements in Amarillo, Texas.

30.     In every facility, male inmates have identified Ms. Star as feminine and demanded that she perform sexual acts for them or pay them for protection against such demands and the repercussions of not acceding to such demands.

31.     TDCJ employees have taken inadequate steps to protect Ms. Star, including but not limited to, transferring her into the general population in different units and different pods/buildings despite knowing that she would face the same threats and violence, rather than placing Ms. Star in safekeeping or taking other reasonable steps to reduce the acts and threats of harm to her. TDCJ employees, including Defendants, have been willfully blind to the ongoing danger that Ms. Star faces, including the danger produced by the transfers themselves, which put the spotlight on Ms. Star whenever she is introduced to a new unit or pod/building, faced with the same demands for sexual favors that she has faced in each of the prior units and pods/buildings.

### Incidents Prior to Ms. Star's Placement in Hughes and Robertson that Put Defendants on Notice of Her Vulnerability to Sexual Assault

32.     Prior to her transfer to Hughes, while in TDCJ custody, Ms. Star was raped, sexually assaulted, forced into coercive sexual relationships, and threatened with violence by other TDCJ inmates. Despite Ms. Star's numerous complaints to TDCJ officials, insufficient action was taken to protect her from the substantial risk of further serious harm.

33.     For example, while housed in Telford, a gang member known as D.D.[5] threatened to hurt Ms. Star if she did not perform sexual acts for him or pay him with commissary items. Ms. Star complained to prison officials about threats from D.D. and other inmates and told them that she was gay with a female alias and feared for her safety. Prison officials did nothing to reduce the threats of harm to Ms. Star and disciplined Ms. Star for declining to leave her cell because she feared serious harm from D.D.

34.     In an effort to gain protection from D.D. and other inmates, Ms. Star submitted to a coerced sexual relationship with a gang member known as M.M. When Ms. Star attempted to end that relationship, M.M. choked her until she agreed to remain in a sexual relationship with him.

35.     In Allred, gang members, including P.X., identified Ms. Star as feminine and threatened to harm her if she did not perform sexual acts for the gang. Ms. Star informed correctional officers that she had received repeated threats, that she was gay, and that she feared for her life. She asked them to place her in safekeeping, but her requests were denied. Ms. Wright, a TDCJ employee in the Allred Unit, told her, "You're black; you'll be alright."

36.     In or about March 2007, TDCJ officials assigned Ms. Star to share a cell with an inmate named C.X., a member of another gang, who began to harass and sexually proposition her. Ms. Star informed a guard that she felt unsafe around her cellmate, but the guard refused to move Ms. Star to another cell or to remove her cellmate from the cell.

37.     Approximately two days later, on March 29, 2007, C.X. threatened Ms. Star with a knife, held her down, and raped her. After Ms. Star reported the rape to a guard, begging him to

---

[5] In an attempt to avoid further retaliation and violence from inmates who have already threatened and/or harmed her, Plaintiff has used initials to identify these inmates.

help her, C.X. threw a fan at Ms. Star, cutting her head.

38.     Linda Remmert, a nurse at the Correctional Managed Care Clinic, treated Ms. Star on March 29, 2007, the night of the rape. The nurse noted "dried secretions to anal area" and an abrasion at the top of Ms. Star's head. The nurse examining Ms. Star the next day noted "due to assault on 03/29/07 inmate feels unsafe around others."

39.     After the rape, TDCJ officials moved Ms. Star into solitary confinement for approximately two weeks, leaving her alone, frightened, and emotionally distressed. She wrote letters asking that C.X. be prosecuted for the rape, but was never informed whether or not he was disciplined for raping her.

40.     Approximately two weeks later, despite her request to be placed in safekeeping, TDCJ officials transferred Ms. Star into the general population of a new facility, Smith. Inmates there again threatened Ms. Star with violence if she did not perform sex acts or pay for protection. Her cellmate, O.R., threatened to rape Ms. Star and forced her to watch him masturbate. Another inmate, P.O.X., demanded that Ms. Star perform sex acts for him if she did not want to be hurt. Ms. Star reported the threats to TDCJ staff verbally and in writing, but officials refused to take the actions necessary to help her.

41.     Correctional officers responded to Ms. Star's requests for protection by telling her "you can't rape someone who's gay," telling her she was having the time of her life, frequently calling her "faggot," and suggesting she was enjoying the attention.

42.     In 2008, Ms. Star was transferred into the general population in Coffield, where she was again threatened with sexual assault by an inmate named T.K. In part because he threatened her and in part because he offered to protect her from other predatory men, Ms. Star entered a coerced sexual relationship with T.K. When Ms. Star tried to end the relationship, T.K.

punched her on the left side of her jaw, breaking one of her teeth and causing it to puncture her lip. In fear for her well-being, Ms. Star returned to the coerced sexual relationship with T.K.

### Defendants' Failures to Protect Ms. Star From Assaults and Threats Directed at Her by Other Inmates in Hughes Between 2011 and November 15, 2013

43.     In approximately July 2011, TDCJ officials transferred Ms. Star to Hughes, where she experienced more threats and attempts to sexually exploit her. Ms. Star lived in constant fear that she would be raped again or seriously harmed.

44.     Ms. Star was threatened by various incarcerated people associated with the Crips gang. One member, known as T.X., called her "faggot" and regularly threatened to assault her. On December 25, 2011, T.X. attacked Ms. Star, punching her in the head, face, and torso. Ms. Star reported the threats and the assault to TDCJ officials verbally and in writing.

45.     On February 3, 2012, Ms. Star submitted a grievance in which she described threats she was receiving from gang members and requested to be placed in safekeeping; Ms. Star explained that she is gay, not affiliated with a gang, and did not feel safe. On February 8, 2012, **Defendant Blanchard** denied the grievance, writing, "No action taken due to lack of evidence. No further action will be taken at this time."

46.     Upon information and belief, **Defendant Blanchard** did not investigate Ms. Star's claims prior to denying her grievance, despite his obligation to do so, and despite the fact that Ms. Star had a documented history of being raped and threatened with violence. Moreover, Defendant Blanchard's denial of the grievance due to "lack of evidence" was unreasonable because it is unclear what other evidence could be required in order for Ms. Star to prove that she was entitled to protection from further assaults and threats.

47.     Ms. Star requested in writing approximately five times between December 2012 and May 2013 that she be transferred to a dormitory. Upon information and belief, dormitories

12

are safer than the cell blocks because they are patrolled more frequently by TDCJ staff and have more security cameras than cell blocks. Ms. Star's requests were denied, despite her documented history of being sexually abused, assaulted, and threatened, and her vulnerable status. Ms. Star complained to **Defendant Marez** and to the grievance committee about the denial of her requests to be moved to dormitories and the threats to her safety.

48.     In or around March 2012, Bloods gang members, including E.H., demanded that Ms. Star pay for their protection or "ride," meaning perform sexual acts for them. In or around March 2013, Ms. Star also complained to correctional officers about threats she was receiving from R.B., who was incarcerated in the unit. In or around 2013, a Bloods gang member known as A.X. began writing sexually explicit letters to Ms. Star, demanding that she perform sexual acts for him in return for his protection. Another Blood, known as C.Y.X., made similar demands of Ms. Star.

49.     Ms. Star informed TDCJ officials of the threats and demands, including Officer Thompson on or around April 19, 2013, and requested to be moved out of the general population and placed in safekeeping. TDCJ staff did not take reasonable steps to protect her and instead placed Ms. Star at risk for further assault. For example, Lieutenant Aragon called Ms. Star a "snitch" and a "punk" in front of other inmates during lineup, and Sergeant Lopez told Ms. Star in front of other inmates that she should "stop doing gay shit" or fight, instructions which left her vulnerable to sexual assault and disciplinary sanction. Officer Thompson and other officers routinely pretended to grab Ms. Star's buttocks, which they referred to as the "grab-ass" game.

50.     On May 12, 2013, C.Y.X. and A.X. jointly confronted Ms. Star while she was at church and accused her of "snitching" on them. C.Y.X. said that a correctional officer had informed C.Y.X. that Ms. Star had reported that C.Y.X. was a gang member who threatened to

sneak into her pod and assault her any chance that he got. A.X. punched Ms. Star on the right side of her jaw, causing swelling and pain to her jaw and face.

51.     Ms. Star went to the infirmary after the assault. She reported the attack and the threats to TDCJ officials verbally and in writing.

52.     **Defendant Blanchard**, who had reviewed previous requests for protection from Ms. Star, denied her grievance on May 20, 2013, using formulaic language: "[T]here was no evidence or witnesses presented to substantiate your claims. No further action is warranted at this time." **Defendant Blanchard** failed to actively investigate Ms. Star's complaints and was deliberately indifferent to her obvious vulnerability based on her gender identity, perceived sexual orientation, history of victimization, and the physical evidence of the assault by A.X.  He also imposed an unreasonable standard to be entitled to protection—that in order to be entitled to protection from threats and assaults, an inmate must have corroborating witnesses to threats and assaults that rarely have corroborating witnesses, especially when witnesses are threatened with being labeled a "snitch" and being assaulted because they have snitched.

53.     In October 2013, an inmate known as C.F. threatened to assault Ms. Star if she did not perform sexual acts for him. When she refused, he attacked her on October 2, 2013 in the hallway by the dining hall, cutting her lip and her left hand, causing swelling and bruising on the left side of her face and jaw line and a knot on the left side of her head.

54.     Ms. Star filed a grievance regarding the assault and threats from C.F. On October 22, 2013, **Defendant Blanchard** responded that "evidence was insufficient" and again decided that no action was warranted to protect Ms. Star. Defendant Blanchard again imposed an unreasonable standard and was deliberately indifferent to Ms. Star's obvious vulnerability based on her gender identity, perceived sexual orientation, history of victimization, and the physical

14

evidence of her injuries.

55.    On October 17, 2013, in desperation, Ms. Star wrote a letter to **Defendant Dean**, the Senior Warden at Hughes, explaining that she feared violence because of her sexual orientation and requesting to meet with him to discuss the possibility of being placed in safekeeping. He did not meet with her, nor did he place her in safekeeping or take other reasonable action to protect her from further threats and harm.

56.    Ms. Star continued to receive threats and unwanted sexual advances from inmates in the general population at Hughes. For example, in 2013, J.T., a member of the Crips gang, sexually propositioned Ms. Star whenever he saw her.

57.    On November 4, 2013, Ms. Star attended a meeting with the Unit Classification Committee ("UCC"), headed by **Defendant Marez**. She told **Defendant Marez** and the other members of the UCC that she was gay with a female alias, that she had been raped by inmates in the past, and that she had been repeatedly threatened with sexual and other violence. She explained that she feared for her life and requested to be reassigned to safekeeping and protected.

58.    **Defendant Marez** and the other members of the UCC denied Ms. Star's request for safekeeping, refusing to take steps necessary to protect her and forcing her back into the general population.

59.    Ms. Star submitted a written grievance on November 6, 2013, appealing the UCC's November 4, 2013, decision to deny her safekeeping request. It stated:

> I am gay and have been taken advantage of in the past. . . . My documented alias is 'Passion' which is not masculine at all. All of my problems stem from being a homosexual in a general population of offenders who have constantly attempted to take advantage of me or request sexual favors. . . . During my time in prison, . . . I have only been moved from 1 pod to another or section in general population where these same offenders and their gang affiliated homeboys still have easy access to get to me. TDCJ does not control the gang influenced general population enough to ensure . . . homosexual offenders safety from being

assaulted, threatened or extorted.

60.     On November 13, 2013, during a church service, J.T. threatened Ms. Star again. He said loudly in front of other Crips that Ms. Star "belonged" to him. He told her that refusal was not an option and that, since she was gay, she had to "stay in a ho's place."

61.     The next day, November 14, 2013, **Defendant Blanchard** denied Ms. Star's November 6, 2014 grievance, responding solely: "You did not meet the criteria to be placed in safekeeping." **Defendant Blanchard** did not explain what the criteria were or inform Ms. Star of any recourse she might take to obtain protection against assault.

62.     On November 15, 2013, Officer Johnson and Officer Deevers, members of the Security Threat Group, were sent to interview Ms. Star about the gang threats to her as a result of an offender protection investigation initiated by her building supervisor. Instead of taking Ms. Star seriously, Officer Johnson told her, "You've fought once. Fight again," again putting Ms. Star at risk of sexual assault and disciplinary sanction. Officer Deevers told Ms. Star that they had no intent of forwarding Ms. Star's request for help to the Safe Prisons Program.

63.     Ms. Star appealed the UCC's denial of her request to be in safekeeping to the State Classification Committee ("SCC") on November 15, 2013, stating that she lives with the "constant threat of being hurt" because she is gay and effeminate in the general population. She also explained that she has been forced "to be sexually active in the past to ensure [her] safety and to protect [herself] from aggressive cellies."

### November 19 and 20, 2013: Pleas for Safekeeping are Ignored, with Horrific Results

64.     On November 19, 2013, Ms. Star again appeared in front of the UCC, composed of **Defendant Blanchard, Defendant Walters,** and **Defendant Sigmund**. Ms. Star told them about the threats she received from J.T. and other inmates and again requested to be placed in

safekeeping. **Defendant Blanchard, Defendant Walters,** and **Defendant Sigmund** denied Ms. Star's request for protection and ordered her to be returned to "the next available cell" in her custody level in the general population.

65.     Prior to reporting the threats, Ms. Star and J.T. were housed on different pods. On November 19, 2013, TDCJ officials, including **Defendants Blanchard, Walters,** and **Sigmund**, in deliberate indifference to the substantial risk to Ms. Star's safety, moved her into 8 Building, L-Pod, where J.T., the specifically identified person from whom she was seeking protection, was housed.

66.     On this same day, November 19, 2013, on her way to dinner, Ms. Star appealed to **Defendant Pickett**, the 8 Building supervisor, for help. She explained the history of violence and threats directed against her by other inmates in Hughes and told him that she had already received threats from Crips gang members, that day, since being moved to L Pod. **Defendant Pickett** told her that it was "not [his] problem" and refused to do anything to help her.

67.     That evening, Ms. Star filed an emergency grievance appealing the UCC's denial, again requesting to be moved to safekeeping, and explaining the threats that she had received from J.T. and other Crips.

68.     The very next morning, November 20, 2013, the assault that she had been begging to be protected from occurred. J.T. and other Crips gang members brutally attacked Ms. Star from behind as she headed to breakfast. J.T. called her a "snitching faggot." As other members of J.T.'s gang watched, J.T. repeatedly slashed Ms. Star's face with a razor while she struggled (the "Razor Attack"). One cut came within a quarter of an inch of her right eye. Ms. Star bled profusely and suffered intense pain.

69.     As a result of the brutal Razor Attack, Ms. Star was taken to Correctional

Managed Care. The nurse who treated Ms. Star, on November 20, 2013, noted "lacerations to the facial area," that required a total of 36 sutures. These included a laceration to the top of her right forehead, 5-½ centimeters long, closed with 8 sutures; one above her right eyebrow, 5-¼ centimeters long, closed with 9 sutures; one on the outer edge of her right eye, 4 centimeters long, closed with 7 sutures; and two below her right eye, both 5 centimeters long, closed with 8 sutures and 4 sutures, respectively. The nurse also noted a one-centimeter laceration on the top of Ms. Star's right ear crease, which was closed with Dermabond, and two additional lacerations deemed superficial, on the top of her head and on her right check.

70.     Despite the sutures and Dermabond, several of the lacerations reopened, causing Ms. Star to bleed further. These lacerations are leaving prominent, raised scars on her face, which are likely to be permanent.

71.     After the Razor Attack, **Defendant Sigmund** brought Ms. Star her property. Ms. Star told **Defendant Sigmund** to look at her and said that she would have to live with this— meaning the lacerations and scarring—for the rest of her life. **Defendant Sigmund** said only, "Ah, man," and left.

72.     On November 22, 2013, two days after the Razor Attack occurred, **Defendant Maldonado** denied the grievance requesting assignment to safekeeping that Ms. Star had submitted on November 19, 2013, prior to the Razor Attack. **Defendant Maldonado** wrote, "You were seen by UCC on 11/19/13.… The committee did not find sufficient evidence to support your allegations. Due to lack of evidence you were released from transient and scheduled to move to the next available cell in your custody."

73.     **Defendant Maldonado** failed to mention that since grieving the UCC's decision to deny her protection on November 19, 2013, the attack that Ms. Star had warned would happen

had indeed happened. **Defendant Maldonado** failed to conduct an active investigation into Ms. Star's urgent pleas for help and was deliberately indifferent to her statements that she was in danger despite her vulnerable status based on her gender identity, perceived sexual orientation, and history of victimization, and the recent mutilation of her face by J.T.

74.    On November 22, 2013, Ms. Star was again taken in front of the UCC, composed of **Defendant Blanchard, Defendant Walters** and **Defendant Sigmund**. Ms. Star again informed **Defendant Blanchard, Defendant Walters,** and **Defendant Sigmund** of the assaults and the threats against her, including the Razor Attack, and requested to be placed in safekeeping.

75.    Despite the recent attack, the razor wounds, and Ms. Star's obvious vulnerability, **Defendant Blanchard, Defendant Walters,** and **Defendant Sigmund** again denied Ms. Star's request to be housed in safekeeping. **Defendant Blanchard, Defendant Walters,** and **Defendant Sigmund** instead recommended that Ms. Star be transferred to the general population of another unit.

76.    **Defendant Blanchard, Defendant Walters,** and **Defendant Sigmund** recommended unit transfer even though they knew that gay men and transgender women were generally vulnerable to sexual assault, that gangs operated throughout TDCJ, and that Ms. Star would be targeted by members of J.T.'s gang in the new unit. Upon information and belief, **Defendant Blanchard, Defendant Walters,** and **Defendant Sigmund** were aware that transferring Ms. Star to the general population of a different unit had been ineffective to protect Ms. Star in the past and would be ineffective to protect her from further serious harms. While informing Ms. Star on November 22, 2013, of the UCC's decision to transfer her rather than place her in safekeeping, **Defendant Blanchard** taunted Ms. Star, "Now I bet you really feel like

19

your life is in danger."

77.     On November 26, 2013, **Defendant Maldonado** concluded, when reviewing a grievance submitted by Ms. Star on November 20, 2013 after the Razor Attack, that at last there was "sufficient evidence" to support Ms. Star's claims, but instead of approving Ms. Star's request to be placed in safekeeping, **Defendant Maldonado** recommended that Ms. Star be transferred to the general population in a different unit. **Defendant Maldonado** denied the request for safekeeping even though he was aware that transferring Ms. Star to the general population of a different unit had been ineffective to protect Ms. Star in the past and would be ineffective to protect her from future harm.

78.     On November 29, 2013, Ms. Star appealed the decision to send her to general population in a new unit, stating that:

> simply recommending that I be transferred off the unit isn't enough to ensure that I am no longer victimized.… I followed instruction and was placed back into a position to be hurt—knowingly. So, I request safekeeping away from the general population of offenders that have victimized me and will continue to do so.

79.     **Defendant Armstrong**, who had previously reviewed other grievances appealed by Ms. Star to the SCC and was on notice that Ms. Star was particularly vulnerable to abuse in the general population, reviewed Ms. Star's November 29, 2013 grievance. On January 8, 2014, **Defendant Armstrong** denied Ms. Star's appeal, indicating that Ms. Star had been designated "not for same unit" as J.T., transferred to Robertson, and that no further action was warranted. **Defendant Armstrong** disregarded the fact that transferring Ms. Star to a new unit would not protect her, rubber-stamped the UCC's actions, failed to actively investigate Ms. Star's claims, and was deliberately indifferent to the significant threat of serious harm to Ms. Star.

**Defendants' Failures to Protect Ms. Star From Assaults and Threats Directed at Ms. Star by Other Inmates in Robertson**

80.     On December 6, 2013, TDCJ officials transferred Ms. Star to the general population in Robertson. TDCJ officials did not use the relevant information available at intake, including Ms. Star's history of sexual abuse and gender identity to screen her for vulnerability and separate her from likely aggressors.

81.     J.T., the instigator of the Razor Attack, had been housed in the general population of Robertson prior to his transfer to Hughes, and he was well known at Robertson as a high-ranking member of the Crips gang.

82.     Soon after she arrived in Robertson, Crip gang member T.T. spread the word among the Crips in Robertson that Ms. Star was a "snitching faggot" and told Ms. Star that the Crips at Robertson would finish what J.T. started.

83.     Inmates in Robertson also identified her as feminine and aggressively propositioned her for sex. For example, from January to March 2014, a Crips gang member known as C.G.X. repeatedly pressured Ms. Star to perform sexual acts for him in return for her safety. C.G.X. told Ms. Star that she had to find a man to protect her, or be raped.

84.     Ms. Star informed correctional officers of the threats against her, but they failed to take reasonable steps to protect her.

85.     On or around December 11, 2013, in response to her request for an offender protection investigation ("OPI"), **Defendant Lopez** told Ms. Star to "suck dick, fight or quit doing gay shit and you'll be okay but quit running me with OPIs," again putting Ms. Star in the unreasonable position of risking disciplinary action for fighting back.

86.     On December 12, 2013, Ms. Star appeared before the UCC in Robertson and explained that she was gay, had a history of sexual and physical assaults in other TDCJ facilities,

including the recent Razor Attack by J.T., as well as the sexual coercion she had experienced at the hands of other TDCJ inmates, and was afraid that she would be targeted by the Crips in Robertson once they learned about the incident with J.T. Ms. Star explained that she feared for her life, and requested to be placed in safekeeping, but her request was denied.

87. Ms. Star filed and appealed additional grievances in which she explained that J.T. had until recently been a high ranking member of the Crips gang on Robertson, members of the Crips gang associated with J.T. were housed in close proximity to her, and that she feared that she would be attacked again. **Defendant Armstrong**, on behalf of the SCC, disregarded the substantial risk of serious harm to Ms. Star and denied Ms. Star's grievances in which she sought additional protection on or around January 30, 2014, February 6, 2014, and February 21, 2014.

88. In or around March 2014, an inmate known as P.N., also a member of the Crips, sent Ms. Star a letter threatening to kill Ms. Star. Ms. Star gave the letter from P.N. to Officer Scott, a member of the Security Threat Group, on or around March 27, 2014, and asked for help and protection, but he did not take action to help her.

89. In desperation and fear, Ms. Star sent letters to the Safe Prisons Program Coordinator, **Defendant White** at the SCC, and **Defendant Bales**, the PREA ombudsman, begging for help.

90. On April 7, 2014, Ms. Star appeared in front of the UCC at Robertson, headed by Assistant Warden Gonzales, and again explained the threats to her safety and begged to be placed in safekeeping. The UCC denied Ms. Star's request to be placed in safekeeping, but recommended that the SCC approve her for transfer to the general population of yet another new unit.

91. Ms. Star renewed her plea to be placed in safekeeping and informed the SCC that

transferring her to general population in a new unit would not be sufficient to protect her. On

April 9, 2014, she wrote in a grievance that the dangers to her were

> all rooted in the fact that I am a homosexual housed in the gang influenced
> general population of offenders… Just recommending that I be transferred to
> another unit will not ensure my safety, just as it did not after the 3-29-07 sexual
> assault, nor after the 11-20-13 assault with a weapon. I am an offender with a
> 'potential for victimization', otherwise I wouldn't be constantly victimized and
> threatened by other offenders.

92.     Soon after, Ms. Star received a response from **Defendant Bales** dated

April 8, 2014, acknowledging receipt of her letters to him dated March 27, 2014, and

March 28, 2014, in which she described her history and the threats to which she had been

subjected at Robertson. **Defendant Bales** wrote that the "unit administration was unable to

substantiate the allegations," explaining that "'unsubstantiated' means there was insufficient

evidence to determine if the incident occurred or did not occur." In deliberate indifference to Ms.

Star's safety, the PREA Ombudsman failed to conduct an active or independent investigation or

to take Ms. Star's claims seriously, despite the history of victimization, vulnerability, and clear

evidence of her prior injuries. Instead, **Defendant Bales** informed Ms. Star that the inquiry

would be closed and no further action would be taken.

93.     Ms. Star again sent a letter to **Defendant Bales** on May 13, 2014, writing that she

had been called a "snitching faggot … told that I need to find a man and threatened with rape."

94.     On May 30, 2014, **Defendant Armstrong** denied Ms. Star's appeal to the SCC.

**Defendant Armstrong** informed Ms. Star in writing that the SCC had not only rejected Ms.

Star's request to be moved to safekeeping, but had also rejected the UCC's recommendation that

Ms. Star be transferred to a different unit. Despite being aware of Ms. Star's history of being

threatened and assaulted, including the assault in Hughes, **Defendant Armstrong** instructed that

Ms. Star should be placed back in the general population in Robertson in the midst of the

incarcerated people **Defendant Armstrong** had been informed were threatening Ms. Star's life.

95.     On or about June, 5, 2014, Ms. Star again appeared in front of the UCC at Robertson headed by Assistant Warden Gonzales and explained the threats that she was receiving and her fear for her safety.  This time the UCC agreed that Ms. Star should be placed in safekeeping as a result of vulnerability and the risk of serious harm to her and sent a recommendation to the SCC that Ms. Star be transferred to safekeeping.

96.     On or around June 17, 2014, Warden Fox informed Ms. Star that the SCC had denied the UCC's recommendation to place her in safekeeping, meaning that the staff at the SCC thought that Ms. Star should remain in the general population in Robertson even though they knew that her life was at risk.

97.     After the SCC denied the UCC's recommendation of unit transfer, the Senior Warden at Robertson moved Ms. Star to a different building, Building 3, in the general population at Robertson on or about June 17, 2014.

98.     Soon after she arrived in Building 3, T.T. spread word to the Crips gang members there that Passion was a "snitching faggot" who should be killed. A Crips gang member in Building 3, known as T.K.X., told Ms. Star that she would be killed. He called her a "snitch" and a "faggot" and said that she could not "run forever" but would sooner or later "have to face the consequences" because she rejected J.T. and pressed charges against him. Ms. Star received similar threats from other members of the Crips in Building 3.

99.     Ms. Star filed another grievance on July 21, 2014, detailing threats she had received from Crips gang members in the new building. She said that the Crips wanted to retaliate against her because of her conflict with J.T. while at Hughes. She wrote, "I have been told that I will be killed if I remain in population."

100.    On or around July 27, 2014, the day after an outside attorney visited Ms. Star for the first time in Robertson, Sergeant Marquez moved Ms. Star into isolation, where she remained until November 16, 2014.  During this time, Ms. Star was confined to a cell approximately 10 feet by 8 feet, for more than 23 hours per day.  Defendants kept Ms. Star in involuntary segregated housing for more than 110 days, without a disciplinary infraction or a hearing.

101.    When Ms. Star asked Correctional Officer Lopez why she was stuck in solitary without a hearing or a disciplinary infraction, while the investigation into the threats against her was pending, Lopez told her to "quit filing OPIs," if she did not want to be in isolation.

102.    Upon information and belief, Defendants use confinement in isolation and the threat of isolation to deter people in custody from complaining about sexual abuse, threats, and other assaults.

103.    As a result of her involuntary confinement in isolation, Ms. Star suffered from depression, had trouble sleeping, constantly thought about past incidents of sexual assault, and lived in constant fear that at any moment she would be thrown back into the general population to be raped again, instead of being moved to safekeeping. While confined in isolation, she was denied opportunities to attend church, work, study, call her family, and go to the law or regular libraries. For a large portion of her time in isolation, she was even denied the one hour of daily recreation time afforded to inmates housed in administrative segregation.

104.    On August 1, 2014, Ms. Star appeared in front of the UCC headed by Assistant Warden Webb and again asked to be placed in safekeeping. She told the UCC that her problems related to her being a transgender woman confined in the general population in a male prison. Assistant Warden Webb replied, "It's a man's prison. You can't expect to walk around acting like that and not have problems." Denying Ms. Star's request for safekeeping, this time the UCC

recommended that she be transferred away from Robertson due to the risk to her safety and moved into general population in yet another new unit.

105.    On August 1, 2014, and again on August 11, 2014, Ms. Star filed more grievances, outlining the threats made to her safety by gang members and requesting placement in safekeeping. In the August 11, 2014 grievance, Ms. Star wrote:

> [T]ransferring me from unit to unit in general population does nothing to rectify this problem that is pervasive.… I have been threatened with my life as well as threatened with rape. Housing me in general population to repeat the same cycles with different offenders is absurd.…

106.    The next day, Ms. Star wrote directly to SCC, headed by **Defendant White**, requesting placement in safekeeping. She identified herself as a transgender woman and again explained that her "life is in danger."

107.    On September 8, 2014, a transgender woman called Renee Divine was brought into the wing where Ms. Star was confined on a stretcher. Ms. Divine told Ms. Star that she had been sexually assaulted by her cellmate in her previous building. Ms. Star also learned that when Ms. Divine reported the rape to Sergeant Lopez, instead of taking her for medical care and filing a report, Sergeant Lopez forced Ms. Divine to take a shower and placed her back in the cell with her assailant, who raped her again.

108.    When Ms. Star attempted to intervene on behalf of Ms. Divine, Officer Snodgrass told her, "Shut up!  Mind your own business, faggot," and threatened Ms. Star with a disciplinary and "food loaf" as punishment. Upset by the treatment of Ms. Divine and fearing that Ms. Divine would not be able to file a grievance, on September 10, 2014, Ms. Star submitted a grievance reporting the alleged rape of Ms. Divine and the threats she had received from officers when she tried to help Ms. Divine. After Ms. Star filed the grievance, a grievance officer came to her cell and told her that she was permitted only to write grievances about issues that concerned her

personally—even though federal law provides otherwise.

109.     After Ms. Star attempted to help Ms. Divine, TDCJ officials transferred Ms. Star on or around September 15, 2014, to a different solitary cell where she remained in isolation in Building 12.

110.     On or around September 17, 2014, the SCC, denied Ms. Star's request for safekeeping and the UCC's recommendation that Ms. Star be transferred to a new unit, in effect ordering Ms. Star back into the general population in Robertson, where the risk that she would be seriously harmed again was substantial.

111.     The UCC at Robertson decided to appeal the SCC's rejection of their last recommendation that Ms. Star be transferred away from Robertson because of the risk of serious harm to Ms. Star if she was placed back in the general population. Even though the UCC knew that sending Ms. Star to general population in a new unit would not be sufficient to protect her, the UCC did not appeal the SCC's denial of its June 5, 2014 recommendation that she be placed in safekeeping.

112.     On or around September 26, 2014, **Defendant Fuster**, writing on behalf of the SCC, denied another of Ms. Star's grievances in which she sought additional protection and placement in safekeeping. Even though **Defendant Fuster** possessed information about the current threats to Ms. Star in Robertson and Ms. Star's vulnerability and documented history of being threatened and assaulted, he failed to take reasonable steps to protect her from the risk of serious harm.

### The Cycle Repeats: Continued Fear of Serious Harm in a New Unit, Clements

113.     On November 17, 2014, Passion was transferred from Robertson to Clements, where she was assigned housing in the general population.

114.    During intake, Ms. Star told TDCJ staff at Clements, including the Safe Prison Coordinator at Clements, that she was a transgender woman, that she had a history of being assaulted, and that she was afraid that she would have the same problems in Clements that she had in the six previous units where she had been housed. Instead of expressing concern for her safety, TDCJ staff made fun of her gender identity.  The Safe Prison Coordinator on the unit discouraged her from expressing her gender identity, telling her it would lead to problems.

115.    TDCJ staff at Clements reviewed Ms. Star's record of "offender protection investigations" and attempted to discourage her from filing complaints while at Clements.  They threatened to cause problems for Ms. Star, including writing her up and provoking fights with her cellmate, if she continued to file requests for protection and grievances as she had done in other units.

116.    In November 2014, Ms. Star met with psychologist Ledbetter at Clements, who asked her about her transgender identity.  Ms. Ledbetter insisted that Ms. Star was a man and not a woman and tried to force Ms. Star to admit that she could not be a woman.  Ms. Star was upset by her interaction with Ms. Ledbetter.

117.    Ms. Star has seen several people at Clements who were previously incarcerated with her either at Coffield or Hughes.  For example, J.C., a Crip and a close friend of J.T.'s was previously at Hughes when Ms. Star was there and is now at Clements.  J.C. was present with J.T. when he threatened Ms. Star on November 19, 2013—the day before the Razor Attack. K.H., a Crip who is also now at Clements, was incarcerated at Coffield when Ms. Star was there and made aggressive sexual advances towards Ms. Star at Coffield until T.K., with whom Ms. Star was in a violent, coerced sexual relationship, made K.H. stop.

118.    Ms. Star has also run into correctional officers at Clements whom she knows from

28

her incarceration in other units—officers who know about problems she has had on other units as a result of her gender identity and/or perceived sexual orientation.

119.    Ms. Star fears that problems that she has had on other units could follow her to Clements and reignite. She is afraid that as a result she will be attacked again.

120.    Soon after arriving in Clements, Ms. Star was propositioned and questioned by people in custody as to whether she was in a relationship. T.C., a member of the Mandingo Warriors gang, threatened to hurt her if she did not perform sexual acts for him. T.C. called Ms. Star a "ho" and told her, "you have to have a man."  Another incarcerated person grabbed her buttocks and demanded that she perform sexual acts with him.

121.    Since January 2015, K.H., a Crip who knows Ms. Star from Coffield, has been aggressively propositioning Ms. Star for sexual favors.  K.H. told other incarcerated people, including many Crips at Clements, that Ms. Star belonged with him and sent a messenger to arrange a meeting between them, which Ms. Star avoided.

122.    Ms. Star, who does not want to be forced into a sexual relationship, is afraid that she will sexually assaulted or attacked as a result of her refusal to perform sexual acts for incarcerated people at Clements.

123.    As a result of the threats from correctional officers in Clements, Ms. Star is afraid to complain to them about the threats to her safety. She is afraid that they will retaliate against her rather than helping her, including by allowing other incarcerated people to harm her or confining her to suffer in involuntary, isolated segregation again.

124.    Even though Ms. Star is afraid that she will be more at risk of harm if she complains about the threats against her, Ms. Star is determined to do so.  Ms. Star is filing administrative grievances.  She is also writing letters to **Defendant White** at the SCC and

**Defendant Sharp**, the current PREA Ombudsman, to confirm that moving her to a new unit has not been sufficient to protect her and repeating her request to be moved to safekeeping.

### Particular Vulnerability of LGBT People in Custody

125.    At all times relevant to this action, Defendants were aware that LGBT people, like Ms. Star, are particularly vulnerable to sexual abuse while incarcerated in TDCJ facilities and that there is a heightened risk that they will be sexually or physical assaulted.  Defendants knew that LGBT and gender-nonconforming people are sexually abused more frequently in prisons and jails than other inmates and are widely considered particularly vulnerable to sexual abuse in the correctional context.

126.    At all times relevant to this action, Defendants were aware of PREA, which was unanimously passed by the Texas Legislature and signed into law by former Texas Governor George W. Bush in 2003.[6] TDCJ administrators, including **Defendant Livingston**, participated in public hearings conducted by the bipartisan National Prison Rape Elimination Commission ("NPREC"), submitted comments on the proposed standards in May 2010 and April 2011, and provided documents used by the NPREC in preparing its recommendations. After years of study, NPREC released its report and recommended national standards, finding that: "Sexual abuse is not an inevitable feature of incarceration.  Leadership matters because corrections administrators can create a culture within facilities that promotes safety instead of one that tolerates abuse." NPREC noted that "[r]esearch on sexual abuse in correctional facilities consistently documents the vulnerability of men and women with non-heterosexual orientations and transgender individuals" and specifically noted "that full adoption of the PREA standards by all of the

---

[6] As part of PREA, Congress established the bipartisan National Prison Rape Elimination Commission to investigate the problem of sexual abuse of people in government custody and to propose standards to eliminate such sexual abuse. The final standards became effective June 20, 2012, when they were published in the *Federal Register*. *See* 28 C.F.R. Part 115.

nation's prisons and jails is necessary to achieve the elimination of sexual abuse in confinement facilities."

127.    Defendants also are aware that LGBT people are particularly vulnerable because this information is readily available on the website and in publications of various correctional associations, including the Department of Justice, the National Institute of Corrections, and the American Jail Association.  For example, the American Jail Association has reported that "[m]ore than any other group, male-to-female transgender inmates (trans women) who are housed with men are at risk for sexual victimization and harassment in jails and prisons," and the National Institute of Corrections noted that while incarcerated, "men and women with nonheterosexual orientations, transgender individuals, and people with intersex conditions were highly vulnerable to sexual abuse."

128.    The vulnerability of LGBT people to sexual assault while incarcerated has also been discussed by organizations, such as Human Rights Watch and Just Detention International, and the press, such as the *Houston Chronicle* and the *Los Angeles Times*.

129.    TDCJ's written policy recommends that an inmate's sexual orientation and/or gender identity be taken into account when assigning housing, including placement in safekeeping, to reduce the possibility of sexual abuse. TDCJ's internal training documents note that LGBT people are vulnerable to sexual abuse while incarcerated and have a greater potential for being victimized than other people in custody, and upon information and belief, Defendants were aware of this information in TDCJ's training documents.

130.    Upon information and belief, at all times relevant to this action, Defendants were aware that LGBT people incarcerated in TDCJ are vulnerable to sexual abuse.

**There Is a Pattern and Practice of Sexual Abuse of LGBT People in TDCJ Custody**

31

131.    There is a pattern pursuant to which LGBT people are sexually assaulted in TDCJ.

132.    Ms. Star is not the only LGBT person incarcerated in TDCJ whose complaints about sexual assault and the threat of sexual assault have been ignored.

133.    Defendants have been confronted with numerous complaints and lawsuits by LGBT people related to sexual assault in TDCJ and, upon information and belief, knew about other LGBT people who were survivors of sexual assault while incarcerated.

134.    Statistics published over the last half decade show that sexual abuse of inmates is a significant and insufficiently addressed problem in TDCJ facilities.

135.    The Bureau of Justice Statistics ("BJS"), a branch of the Department of Justice, published its first-ever inmate survey on sexual victimization in 2007 based on data from 146 prisons and found that five of the ten prisons with the highest reported levels of sexual abuse were run by TDCJ, including Clements.

136.    Over 2008 and 2009, BJS conducted a follow-up survey of 29,954 inmates at 167 prisons to study rates of inmate-on-inmate sexual victimization.  The 2010 report on that survey designated Hughes as having the highest rate of inmate-on-inmate sexual victimization of all the prisons surveyed, at 8.6 percent.

137.    Over 2011 and 2012, the BJS conducted a third survey, this time of 38,251 inmates in 233 prisons nationwide.  The 2013 BJS report identified eleven "high-rate" prisons, meaning inmates there reported a rate of sexual victimization at least twice the national rate of 1.7 percent for male prisons.  Clements again appeared with rate of 6.8 percent of people incarcerated in Clements reporting that they have been sexually assaulted, the eighth highest rate of all prison facilities surveyed nationwide.

138.    TDCJ is and has been aware of these and similar statistics.  For example, from September 2012 through August 2013, TDCJ's Office of the Inspector General documented 378 allegations of inmate abuse meeting the elements of Texas Penal Code 22.011 (Sexual Assault) and 22.021 (Aggravated Sexual Assault): 14 from Hughes, 18 from Robertson, and 24 from Clements.

139.    In 2011, the Department of Justice's Review Panel on Prison Rape held a PREA-mandated hearing and invited three correctional institutions with a high prevalence of victimization to submit testimony. **Defendant Livingston** provided testimony for TDCJ and addressed statistics showing that abusive sexual contact at one facility were alarmingly high. The panel also heard testimony that TDCJ's "practice does not appear to conform to [its] policies." The Panel noted that a significant number of complaints were from inmates who self-identified as homosexual and recommended that prison administrators provide training to staff on the vulnerability of homosexual inmates and to take steps to protect them from sexual assault."

140.    Defendants also are and have been aware that prison gang-related crime and violence pose a significant threat to LGBT people in custody. Gang members, including members of the Bloods and the Crips, have been responsible for many sexual and physical assaults and homicides in TDCJ facilities.

141.    TDCJ collects, analyzes, and disseminates gang-related information to its staff and law enforcement agencies. TDCJ currently recognizes twelve gangs or security threat groups ("STGs"), including the Bloods and the Crips, who operate and coordinate unlawful activities across TDCJ facilities and outside TDCJ facilities.

142.    In particular, **Defendant Davis**, as Deputy Director of Management Operations, is responsible for overseeing, *inter alia*, the STG Management Office, and thus is aware of these

gangs or STGs, including the Bloods and the Crips, that such groups pose a significant threat to

LGBT people in custody, that they have been responsible for many assaults and murders in

TDCJ facilities, and that such groups operate and coordinate unlawful activities across TDCJ

facilities and outside TDCJ facilities.

143.    Additionally, **Defendant Eason**, as Deputy Director of Prison and Jail

Operations, is responsible for overseeing, *inter alia*, the Security Operations Department, and

thus is aware of the impact of gangs and STGs on the security of TDCJ facilities, the serious

incidents involving such groups, and staffing and operations policies, procedures, and

compliance.

144.    At all relevant times, Defendants were aware that individuals who have a conflict

with one gang member are at risk of violence from other members of the same gang, that gangs

or STGs operated throughout TDCJ facilities, and that their reach extends beyond a particular

unit.

### Defendants Have Authorized or Condoned Conduct that
### Tolerates Sexual Abuse of Incarcerated LGBT People

145.    **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White**

condoned, ratified, and/or adopted and continue to condone, ratify, and/or adopt widespread and

pervasive customs and practices that are so deficient that these defendants are deliberately

indifferent to the substantial risk of serious harm to LGBT inmates, including Ms. Star.

146.    The custom condoned by **Defendants Livingston, Stephens, Sharp, Eason,**

**Davis, Bales, and White** permits inmates who are vulnerable to sexual abuse, like Ms. Star, to

remain in the general population without adequate protections to prevent them from being

sexually and/or physically assaulted.  Upon information and belief, TDCJ staff members

regularly refuse to offer safekeeping protection to inmates, including Ms. Star, who are

vulnerable to sexual abuse, even when the inmates specifically and repeatedly request that status and other alternatives to protect them prove ineffective.  Consequently, many vulnerable inmates are victims of sexual assault, which includes being coerced into involuntary sexual relationships with stronger or more powerful people in custody, who are frequently gang members.

147.    **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** condoned and ratified a custom and practice by which incarcerated people are not adequately screened for vulnerability to sexual abuse and separated from likely aggressors, and continue to condone or ratify this custom or practice. Upon information and belief, TDCJ staff do not use the information available to them that LGBT people and people who have been previously sexually abused in the general population, like Ms. Star, are substantially vulnerable to future serious abuse. The custom in place permitted TDCJ staff at multiple units to suggest that Ms. Star should enjoy being sexually abused and ridicule her, instead of recognizing that Ms. Star's LGBT identity makes her more vulnerable to sexual assault.

148.    **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** failed to train and/or supervise, and continue to fail to train and/or supervise the implementation of written policies that, in contrast to the widespread and pervasive custom and practice, require that inmates be screened for vulnerability and separated from likely aggressors, taking into account "whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming"; "whether the inmate has previously experienced sexual victimization"; and "the inmate's own perception of vulnerability." § 115.41.

149.    **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** condoned and ratified, and continue to condone and ratify, a custom and practice of insufficient direct supervision to protect inmates from sexual abuse or for guards to properly supervise the

inmates in their care. Upon information and belief, TDCJ has not been able adequately to

identify and retain qualified employees. Upon information and belief, inattentive and

undercompensated guards allow gang members and other aggressive inmates to have the run of

the prison, to exert control over other inmates, and to victimize vulnerable inmates. Upon

information and belief, video surveillance is insufficient to document and/or deter sexual

predation in the general population at TDCJ facilities. Many areas in the general population lack

security cameras.

151.     In contrast to the widespread and pervasive custom and practice in TDCJ, Texas's

written policies and PREA require that TDCJ maintain "adequate levels of staffing, and, where

applicable, video monitoring, to protect inmates against sexual abuse." 28 C.F.R. § 115.13.

Despite their awareness of the problems resulting from not implementing this written policy,

**Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** failed and continue

to fail to adequately train and/or supervise their subordinates with regards to adequate

supervision of the people in their custody.

151.     **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White**

condoned and ratified a custom and practice where TDCJ staff are inadequately trained on the

importance of protecting inmates from sexual abuse, and they continue to do so. Upon

information and belief, training provided to TDCJ employees is perfunctory and inadequate to

ensure that staff members know how to prevent sexual abuse and how to respond to allegations

of threatened sexual abuse. Upon information and belief, PREA training is a joke for many

TDCJ employees, who believe that sexual assault of LGBT people is funny. Upon information

and belief, high turnover rates and the influx of new staff means that many staff have not been

trained or had only basic training. According to a 2012 survey of TDCJ correctional officers,

conducted by the Texas Criminal Justice Coalition, more than half the correctional officers surveyed do not believe that they receive adequate training, and nearly two-thirds do not believe the training they have received has prepared them for the challenges of their job.

152.     In contrast to the widespread and pervasive custom and practice in TDCJ, Texas's written policies and PREA require TDCJ to train all employees who may have contact with inmates on the zero-tolerance policy for sexual abuse and sexual harassment; the dynamics of sexual abuse and sexual harassment in confinement; how to detect and respond to signs of threatened and actual sexual abuse; how to prevent, detect, report, and respond to allegations; the common reactions of sexual abuse and sexual harassment victims; and how to communicate effectively and professionally with inmates, including LGBT, intersex, or gender-nonconforming inmates. *See* 28 C.F.R. § 115.31. Despite their awareness of the problems resulting from inadequate training, **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** failed, and continue to fail, to adequately train and/or supervise their subordinates with regards to adequate training of TDCJ staff.

153.     **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** condoned and ratified, and continue to condone and ratify, a custom and practice of disrespect for LGBT people. TDCJ has not adequately trained its staff concerning professional interactions with LGBT or gender-nonconforming inmates. In fact, as alleged above, it is common for TDCJ staff to call inmates "faggot" and "punk," to speak to them in a derogatory manner, and to suggest that gay incarcerated people enjoy being raped. Furthermore, upon information and belief, TDCJ staff purposefully use the incorrect gender pronoun when interacting with transgender people despite the serious harm that this can cause and allow other incarcerated people to target LGBT people for abuse because of their sexual orientation and/or gender

identities.

154.   In contrast to the widespread and pervasive custom and practice in TDCJ, Texas's written policies and the PREA require that TDCJ train its employees "[h]ow to communicate effectively and professionally with inmates, including lesbian, gay, bisexual, transgender, intersex, or gender nonconforming inmates." 28 C.F.R. § 115.13(9).  Despite their awareness of the problems resulting, **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** failed, and continue to fail, to adequately train and/or supervise their subordinates with regards to adequate training of the people in their custody.

155.   **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** condoned and ratified a widespread custom and practice of perfunctory and incomplete investigation of inmate complaints, including grievances, and they continue to do so. TDCJ staff failed, and continue to fail, to actively investigate complaints of assaults, sexual harassment, and threats to the safety of vulnerable incarcerated people, like Ms. Star. Upon information and belief, the widespread custom and practiced condoned TDCJ staff when they failed to adequately review Ms. Star's repeated complaints or respond reasonably given the fact that the assaults and threats were based on her perceived sexual orientation and her gender identity. When investigating Ms. Star's complaints, TDCJ staff, with the acquiescence of Defendants, ignored the well-known culture of silence in prisons that offers swift and severe retribution for "snitches" and instead approached Ms. Star's complaints as necessarily unworthy of attention unless substantiated by additional witnesses or evidence, when often the only witnesses were Ms. Star and the inmate who was threatening or assaulting her. Defendants seemingly ignored the physical evidence of Ms. Star's repeated abuse and summarily closed Ms. Star's grievances, ignoring her pleas to be placed in safekeeping.

156. **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** failed, and continue to fail, to train and/or supervise TDCJ staff to ensure that they gather and preserve direct and circumstantial evidence; take immediate action to protect inmates from a substantial risk of imminent sexual abuse; and take an active role in the investigation, interviewing alleged victims, suspected perpetrators, and witnesses, and reviewing prior complaints and reports of sexual abuse involving the suspected perpetrator, in conformity with written policies. *See* §§ 115.34, 71.

157. In contrast to this widespread and pervasive custom and practice, the Texas Safe Prisons Plan requires that safekeeping status be available for incarcerated people in all general population custody levels "who require separate housing from general population because of threats to their safety due to a history of homosexual behavior, a potential for victimization, or other similar reasons." Inmates in safekeeping sleep and receive their meals and recreation time apart from the general population and are thus provided additional protection from inmate-on-inmate sexual abuse.  Despite their awareness of the problems resulting, **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** failed, and continue to fail, to adequately train and/or supervise their subordinates with regards to the safekeeping policy.

158. **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** condoned and ratified a widespread practice and custom whereby incarcerated people reporting threats to their safety are held in involuntary segregated housing, in conditions known to cause harm to them, and they continue to do so. Upon information and belief, TDCJ staff members employ isolation and the threat of isolation as a tool to deter inmates from complaining about sexual and other abuse in TDCJ facilities. Despite alternative placement options, including safekeeping, as a result of reporting threats against her, Ms. Star has been involuntarily held in

39

solitary confinement for periods exceeding 30 days, in conditions similar to those used to punish inmates for disciplinary infractions.

159.     **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** failed, and continue to fail, to train and/or supervise TDCJ staff in the implementation of Texas's written policies and PREA, which prohibit the use of involuntary segregated housing unless a determination has been made that there is no available alternative means of separation from likely abusers and, in any case, only "until an alternative means of separation from likely abusers can be arranged." *See* § 115.43.

160.     The PREA Ombudsman office, formerly headed by **Defendant Bales** and now headed by **Defendant Sharp,** is charged, *inter alia*, with monitoring the policies for responding to inmate sexual abuse and ensuring that complaints of sexual abuse are impartially and adequately investigated, but does not adequately investigate and respond to complaint of sexual abuse. Upon information and belief, the office employs only three staff members, a staff wholly insufficient to review and investigate hundreds of complaints of sexual abuse every year.

161.     Although **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** are knowledgeable about PREA and have even incorporated many of the mechanisms to prevent sexual abuse in prisons into TDCJ's written policies, such as the Safe Prisons Plan, these defendants have failed, and continue to fail, to adequately train and supervise their staff on the known mechanisms to reduce and prevent sexual abuse of inmates, demonstrating deliberate indifference to the substantial risk of serious harm to LGBT inmates, including Ms. Star.

162.     If **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** had adequately trained and supervised their staff and/or implemented PREA or Texas's written policies, such as the Safe Prisons Plan, Ms. Star would not have lived under the constant threat of

sexual assault and other harm and would not have been repeatedly assaulted.  Defendants' failure to train and supervise their staff and ratification of a culture of apathy toward sexual assault and disrespect for LGBT people caused Ms. Star's injuries and the continuing, severe threat to her constitutional rights.  Consequently, they failed, and continue to fail, to take reasonable steps to protect Ms. Star from the risk of future sexual and/or physical assault.

### Defendants Failed to Act Reasonably after Receiving Direct Notice of the Risk of Serious Harm to Ms. Star

163.    **Defendant Bales**, the former PREA Ombudsman, received several letters from Ms. Star describing the substantial risk of serious harm that she faced, including letters on March 27, 2014, and March 28, 2014. Nevertheless, on April 8, 2014, without determining that her pleas were unfounded, Defendant Bales informed Ms. Star that he would take no action to protect her.

164.    **Defendant White**, Assistant Director of TDCJ's Classification and Records Department, upon information and belief, was aware that Ms. Star had been assaulted in the past by other inmates in TDCJ facilities and was at substantial risk of serious future assaults. Defendant White oversaw the SCC during the times that Ms. Star made numerous appeals to the SCC for protection. Upon information and belief, Defendant White received at least two letters from Ms. Star pleading for help and multiple grievances that Ms. Star submitted, but refused to act or authorize action to protect Ms. Star.

165.    **Defendant Armstrong**, Assistant Regional Director, refused to take or authorize reasonable actions to protect Ms. Star, even though he was aware that she had been assaulted in the past by other inmates at Hughes and Robertson, as well as other TDCJ facilities, and was at risk of future assaults by inmates. Between November 2013 and October 2014, Defendant Armstrong reviewed and denied at least six appeals of grievances in which Ms. Star sought

41

safekeeping because of threats of violence and imminent harm. On May 30, 2014, he denied a recommendation by the UCC at Robertson to transfer Ms. Star to a new unit.

166.    **Defendant Fuster**, Assistant Regional Director, refused to take or authorize reasonable actions to protect Ms. Star even though he was informed that she had been assaulted in the past by other inmates at Hughes and Robertson, as well as other TDCJ facilities, and was at substantial risk for serious future assaults. Defendant Fuster reviewed at least one grievance in which Ms. Star requested safekeeping because of threats of violence and imminent harm. He denied Ms. Star's request for safekeeping and further denied a recommendation by the UCC to transfer Ms. Star from Robertson to a new unit.

167.    **Defendant Dean**, Senior Warden at Hughes, was aware that Ms. Star had been assaulted in the past by other inmates and was at substantial risk of serious future assaults. Ms. Star sent him a letter detailing the threats against her in October 2013. Upon information and belief, Defendant Dean received and reviewed this letter, but took no action to protect her.

168.    **Defendant Blanchard**, Assistant Warden at Hughes, was aware that Ms. Star had been assaulted in the past by other inmates at Hughes and was at substantial risk of serious future assaults. Nevertheless, Defendant Blanchard denied at least four grievances submitted by Ms. Star regarding threats and violence against her. On November 19, 2013, as a member of the UCC, Defendant Blanchard denied Ms. Star's request for safekeeping based on violence and threats against her and had her moved to the same pod in the general population where her attacker was housed, and again denied her request for safekeeping on November 22, 2013, after she was attacked.

169.    **Defendant Maldonado**, Assistant Warden at Hughes, denied at least two grievances submitted by Ms. Star regarding violence and threats of violence against her,

42

disregarded readily available evidence, and failed to adequately investigate Ms. Star's claims. Even though Defendant Maldonado was aware that Ms. Star had been assaulted by other inmates at Hughes in the past and was at substantial risk of serious future assaults, on November 22, 2013, Defendant Maldonado disregarded information that Ms. Star had been viciously attacked two days earlier and denied her request for safekeeping.

170.    **Defendant Marez**, a Major at Hughes, was aware that Ms. Star had been assaulted by other inmates at TDCJ facilities in the past and was at substantial risk of serious future assaults. Nevertheless, he denied at least five requests by Ms. Star to be placed in dormitories, and on November 4, 2013, as a member of the UCC, denied Ms. Star's request for safekeeping.

171.    **Defendant Sigmund**, a Captain at Hughes, was aware that Ms. Star had been assaulted by other inmates at TDCJ facilities in the past and was at substantial risk of serious future assaults. Nevertheless, on November 19, 2013, Defendant Sigmund denied Ms. Star's request for safekeeping and had her moved to the same pod in the general population where her attacker was housed, and again denied her request for safekeeping on November 22, 2013, after she was attacked in that pod.

172.    **Defendant Pickett**, a Sergeant in Hughes, was informed that Ms. Star had been assaulted by other inmates at TDCJ facilities in the past and was at substantial risk of serious future assaults. Nevertheless, on November 19, 2013, Defendant Pickett ignored Ms. Star's desperate plea for help to protect her against a threatened attack and refused to take action to protect her from the attack that occurred the next morning.

173.    **Defendant Walters**, a Classification Secretary at Hughes, was aware that Ms. Star had been assaulted by other inmates at TDCJ facilities in the past and was at substantial risk

of serious future assaults. Nevertheless, on November 19, 2013, Defendant Walters denied Ms.

Star's request for safekeeping and had her moved to the same pod in the general population

where her attacker was housed, and again denied her request for safekeeping on

November 22, 2013, after she was attacked.

174.    In light of the following, **Defendants Bales, Sharp, White, Armstrong, Fuster,**

**Dean, Blanchard, Maldonado, Marez, Sigmund, Pickett, and Walters,** were personally aware

that Ms. Star was at substantial risk of serious harm, and they should have placed her in

safekeeping or taken other actions to reduce the harm and the threat of harm to her.

**FIRST CLAIM FOR RELIEF**
**Preliminary and Permanent Injunctive and Declaratory Relief**
**U.S. Const. Amend. VIII—Deliberate Indifference**
**(Against Defendants Livingston, Stephens,**
**Sharp, Eason, Davis, and White, in their Official**
**Capacities)**

175.    Plaintiff incorporates by reference all previous paragraphs of this Amended

Complaint as if fully set forth here.

176.    With deliberate indifference to Ms. Star's personal health and safety, **Defendants**

**Livingston, Stephens, Sharp, Eason, Davis, and White** failed, and continue to fail, to protect

her from substantial risk of serious harm in violation of her rights under the Eighth and the

Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.

177.    **Defendants Livingston, Stephens, Sharp, Eason, Davis, and White** are aware

that violence in the prison was frequent and regular and that predatory gangs operated across

TDCJ facilities and targeted vulnerable inmates, including Ms. Star, for violence, sexual assault,

and sexual exploitation.

178.    **Defendants Livingston, Stephens, Sharp, Eason, Davis, and White** are aware

that gay men and transgender women housed in male correctional institutions, including Ms.

44

Star, are particularly vulnerable to violence, sexual assault, and sexual exploitation. The substantial risk of serious harm to Ms. Star is obvious.

179.    In addition, **Defendant White** has personal knowledge of the substantial risk of serious harm to Ms. Star and failed to take reasonable safeguards to protect Ms. Star, despite their knowledge of a substantial risk to her safety.

180.    **Defendants Livingston, Stephens, Sharp, Eason, Davis, and White** are disregarding the immediate and substantial risk of serious harm to Ms. Star and failing to act reasonably to prevent Ms. Star from being sexually and physically assaulted.  **Defendants Livingston, Stephens, Sharp, Eason, Davis, and White** failed, and continue to fail, to train, supervise, and enforce TDCJ employees adequately regarding TDCJ policies and, specifically, measures to protect gay and transgender people in custody from the substantial risk of serious harm.

181.    **Defendants Livingston, Stephens, Sharp, Eason, Davis, and White** disregarded, and continue to disregard, a known or obvious consequence of their failure to train and supervise their subordinates adequately and to enforce TDCJ policies. As a consequence of the lack of proper training and/or supervision of TDCJ staff and enforcement of the TDCJ policies, Ms. Star suffered not only a substantial risk of serious harm, but also was assaulted, lacerated, raped, and forced to perform sexual acts against her will.

182.    Contrary to the actual written TDCJ policies, **Defendants Livingston, Stephens, Sharp, Eason, Davis, and White** have condoned, ratified, and /or adopted, and continue to condone, ratify, and/or adopt, a widespread and pervasive custom and practice that deters inmates from filing complaints, denies them protection from sexual assault and physical abuse, refuses to investigate inmate complaints, and fails to staff and fund the facilities in a way that

adequately protects against physical violence among inmates, including measures to protect gay and transgender inmates from the substantial risk of serious harm.

183. **Defendants Livingston, Stephens, Sharp, Eason, Davis, and White** disregarded, and continue to disregard, a known or obvious consequence of the widespread and pervasive custom and practice they have adopted or permitted to occur. As a consequence of the widespread and pervasive custom and practice adopted by these defendants, Ms. Star suffered not only a substantial risk of serious harm, but also was assaulted, lacerated, raped, and forced to perform sexual acts against her will.

184. The actions and omissions of **Livingston, Stephens, Sharp, Eason, Davis, and White** are so grave that they violate contemporary standards of decency by exposing anyone unwilling to a substantial risk of serious harm, and it is clearly established that such deliberate indifference is a violation of the Eighth Amendment's prohibition of cruel and unusual punishment.

185. The Court should declare that the conduct of **Defendants Livingston, Stephens, Sharp, Eason, Davis, and White** as described in this First Claim for Relief violated the Eighth Amendment's prohibition of cruel and unusual punishment, and the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983.

186. Without preliminary and permanent injunctive relief, Ms. Star will most certainly continue to suffer severe irreparable harm for which she has no adequate remedy at law. Ms. Star is likely to succeed on the merits of her claim and, in any event, the balance between the harm to the Plaintiff in failing to grant injunctive relief greatly outweighs any potential harm to the Defendants in granting injunctive relief. Finally, the public interest is always served in holding governmental actors accountable for violating the constitutional rights of its citizens.

187.     The Defendants should be preliminarily and permanently enjoined by a court order directing them to place Ms. Star in safekeeping or take alternative measures to protect her from the threat of sexual assault and other violence in TDCJ and directing them to enforce the existing written policy in all respects that ensures the safekeeping of LGBT incarcerated people, like Ms. Star.

**SECOND CLAIM FOR RELIEF**
**Damages and Declaratory Relief**
**U.S. Const. Amend. VIII**
**(Against All Defendants in their personal capacities)**

188.     Plaintiff incorporates by reference all previous paragraphs of this Amended Complaint as if fully set forth here.

189.     With deliberate indifference to Ms. Star's personal health and safety, **Defendants Livingston, Bales, Stephens, Sharp, Eason, Davis, White, Armstrong, Fuster, Dean, Blanchard, Maldonado, Marez, Sigmund, Pickett, and Walters** failed to protect her from substantial risk of serious harm in violation of her rights under the Eighth and the Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.

190.     In addition, **Defendants Bales, White, Armstrong, Fuster, Dean, Blanchard, Maldonado, Marez, Sigmund, Pickett, and Walters** had personal knowledge of the threats to Ms. Star and the substantial risk of serious harm to her.

191.     **Defendants Livingston, Bales, Stephens, Sharp, Eason, Davis, White, Armstrong, Fuster, Dean, Blanchard, Maldonado, Marez, Sigmund, Pickett, and Walters** failed to take reasonable safeguards to protect Ms. Star despite their knowledge of a substantial risk to her safety.

192.    The actions and omissions of **Defendants Livingston, Bales, Stephens, Sharp, Eason, Davis, White, Armstrong, Fuster, Dean, Blanchard, Maldonado, Marez, Sigmund, Pickett, and Walters** are so grave that they violate contemporary standards of decency by exposing anyone unwilling to a substantial risk of serious harm, and it is clearly established that such deliberate indifference is a violation of the Eighth Amendment's prohibition of cruel and unusual punishment.

193.    **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** failed to train, supervise, and enforce TDCJ employees adequately regarding TDCJ policies and, specifically, measures to protect gay and transgender inmates from the substantial risk of serious harm.

194.    **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** disregarded a known or obvious consequence of their failure to train and supervise their subordinates adequately and to enforce TDCJ policies. As a consequence of the lack of proper training and/or supervision of TDCJ staff and enforcement of the TDCJ policies, Ms. Star suffered not only a substantial risk of serious harm, but also was assaulted, lacerated, raped, and forced to perform sexual acts against her will.

195.    Contrary to the actual written TDCJ policies, **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** have condoned, ratified, and/or adopted a widespread and pervasive custom and practice that deters inmates from filing complaints, denies them protection from sexual assault and physical abuse, refuses to investigate inmate complaints, and fails to staff and fund the facilities in a way that adequately protects against physical violence among inmates, including measures to protect gay and transgender inmates from the substantial risk of serious harm.

196.    By so doing, **Defendants Livingston, Stephens, Sharp, Eason, Davis, Bales, and White** disregarded a known or obvious consequence of the widespread and pervasive custom and practice they have condoned, ratified, and/or adopted.  As a consequence of the widespread and pervasive custom and practice condoned by these defendants, Ms. Star suffered not only a substantial risk of serious harm, but also was assaulted, lacerated, raped, and forced to perform sexual acts against her will.

197.    **All Defendants** were aware that violence in the prison was frequent and regular and that predatory gangs operated across TDCJ facilities and targeted vulnerable people in custody, including Ms. Star, for violence, sexual assault, and sexual exploitation.

198.    **All Defendants** were aware that gay men and transgender women housed in male correctional institutions, including Ms. Star, were particularly vulnerable to violence, sexual assault, and sexual exploitation. The substantial risk of serious harm to Ms. Star was obvious.

199.    The Court should declare that the conduct of **Defendants**, as described in this Complaint and alleged in the First Claim for Relief, above, violated the Eighth Amendment's prohibition of cruel and unusual punishment. The Court should further declare that the law proscribing **Defendants'** conduct was clearly established as unconstitutional at the time they engaged in such conduct.

200.    Plaintiff was harmed and suffered damages as a result of all of the **Defendants'** misconduct, including damages for the physical injuries, permanent disfigurement, excruciating emotional pain, and lasting psychic trauma. Thus, Plaintiff is entitled to recover compensatory damages against all Defendants in their personal capacities.

201.    The **Defendants** acted with a malicious or evil intent or callous disregard of Plaintiff's federally protected rights. Additionally, Defendants engaged in "oppressive" conduct

49

that misused official authority or exploited the Plaintiff's weakness. Accordingly, Plaintiff is

entitled to an award of punitive damages against all Defendants in their personal capacities.

## IV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief from the Court:

1.    A preliminary injunction pursuant to Fed. R. Civ. P. 65 prospectively enjoining Defendants from housing Ms. Star in the general population or, in the alternative, giving adequate notice to counsel of no less than fourteen days prior to any attempt to do so;

2.    A permanent injunction prospectively directing Defendants to maintain Plaintiff in safekeeping status while she remains in TDCJ custody;

3.    A declaratory judgment that the practices, acts, and omissions complained of herein violated Plaintiff's rights;

4.    Expungement of any disciplinary violations on Plaintiff's record connected to Defendants' failure to protect Plaintiff;

5.    Appropriate medical and psychiatric treatment and counseling for Plaintiff's physical and psychic injuries suffered as a result of Defendants' acts and omissions;

6.    Compensatory damages, including damages for the physical injuries, permanent disfigurement, excruciating emotional pain, and lasting psychic trauma, against each Defendant who is named in his or her personal capacity;

7.    Punitive damages against each Defendant who is named in his or her personal capacity;

8.    Pre- and post-judgment interest as permitted by law;

9.    Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

10.     Such further relief as the Court may deem just and proper.

Dated January 28, 2015

Respectfully submitted,

Kenneth D. Upton, Jr.
*Attorney in Charge*
Texas State Bar No. 00797972
Southern District of Texas No. 635808
kupton@lambdalegal.org
Paul D. Castillo
Texas State Bar No. 24049461
Southern District of Texas No. 2451868
pcastillo@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, Texas 75219-6722
Telephone:  (214) 219-8585
Facsimile:   (214) 219-4455

*and*

Jael Humphrey-Skomer*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY  10005-3919
Telephone:  (214) 809-8585
Facsimile:  (214) 809-0055

*and*

By:  _s/ Christina N. Goodrich_
Christopher J. Kondon*
Christina N. Goodrich*
Saman M. Rejali*
K&L GATES LLP
10100 Santa Monica Blvd., 7th Floor
Los Angeles, California 90067
Telephone: (310) 552-5000
Facsimile: (310) 552-5001

*Admitted pro hac vice*

ATTORNEYS FOR PLAINTIFF

51

## CERTIFICATE OF SERVICE

On January 28, 2015, I electronically submitted the foregoing document to the clerk of

court for the U.S. District Court, Southern District of Texas, using the electronic case filing

system of the Court. I hereby certify that I have served the following counsel of record

electronically through the Court's ECF system.

Kim Coogan
Attorney for Defendants Brad Livingston, Ralph Bales, Joni White,
Bruce Armstrong, and Fernando Fuster

Christin Cobe Vasquez
Attorney for Defendants Kenneth Dean, Brian Blanchard, Rene Maldonado,
James Sigmund, Leslie Walters, Ralph Marez, Jr., and Prince Pickett

The following additional defendants have been added in the Amended Complaint and

will be served in accordance with Rule 4, Federal Rules of Civil Procedure: William Stephens,

Lynne Sharp, Lorie Davis, and Robert Eason.

_s/ Christina N. Goodrich_
Christina N. Goodrich